UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | | |
|---|---|---|
| HOWARD JOHNSON INTERNATIONAL, INC., a Delaware corporation, | ) ) ) ) | CIV. 07-1024 |
| Plaintiff, | ) ) | |
| vs. | ) ) | REPORT AND RECOMMENDATION |
| INN DEVELOPMENT, INC., a South Dakota corporation; ROBERT W. ORR, an individual; and RENEE LOGAN, an individual, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**INTRODUCTION**

In this civil action, invoking the court's diversity jurisdiction, plaintiff Howard Johnson International, Inc. (hereafter "Howard Johnson"), sought damages for breach of a franchise agreement with defendant Inn Development, Inc., the obligations of which were personally guaranteed by defendants Robert W. Orr and Renee Logan. On December 22, 2008, the district court, the Honorable Andrew W. Bogue, granted summary judgment in favor of the plaintiff.[1] See Docket 78. An evidentiary hearing was deemed necessary to determine the proper amount of damages owed to the plaintiff. Id. The district court ordered this magistrate judge to conduct the hearing and submit a report and recommendation on the issues of damages, attorney fees, costs, and interest. See Docket 86.

---

[1]The Honorable Judge Bogue passed away June 11, 2009. This case is now assigned to the Honorable Richard H. Battey, Senior United States District Judge.

Accordingly, this court held an evidentiary hearing on June 11, 2009, the transcript of which appears at Docket No. 97. Based on this hearing, the court issues the following report and recommendation as to Howard Johnson's damages.

## FACTS

At the hearing, Howard Johnson was represented by its counsel, Ms. Teresa Cauwels. Mr. Orr and Ms. Logan appeared *pro se*. Two witnesses testified: Ms. Kelly Krug on behalf of Howard Johnson and Ms. Logan on behalf of the defendants. Based on the evidence presented at the hearing, the court makes the following findings of fact.

On December 31, 2001, Howard Johnson and Inn Development entered into a licensing agreement which would allow Inn Development to operate a 67-room hotel in Norfolk, Nebraska, as a Howard Johnson facility. See Exhibit A introduced at the hearing. Prior to entering into this agreement with Howard Johnson, Mr. Orr and Ms. Logan had been operating the hotel as an independently-owned facility named the "White House Inn." See Hearing Transcript (hereinafter "HT") at 34, 52-53; see also Exhibit A.

The licensing agreement had a 15-year term and the obligations of Inn Development were personally guaranteed by Mr. Orr and Ms. Logan. See Exhibit A at page 9, § 5; Docket No. 78 at 2, 4. It is not disputed for purposes of this report and recommendation that Inn Development breached the licensing agreement as of May 2, 2003, and that Mr. Orr and Ms. Logan are liable for damages owing to Howard Johnson as a result of that breach.

The licensing agreement had a liquidated damages clause, under which the maximum amount of damages that Inn Development would be liable for in

the event Inn Development breached the contract would be $100,500. HT 96-97; Exhibit A, at 14-15, § 12. However, this liquidated damages clause in the license agreement was supplanted by an addendum to the agreement which instead substituted actual damages for liquidated damages in the event Inn Development breached the agreement. HT 10; Docket No. 78 at 17; Exhibit A, last two pages. Under this addendum, Howard Johnson now seeks an award of $499,949.90 in damages, or approximately five times the amount it would have been entitled to under the liquidated damages provision. Docket No. 78 at 16.

Kelly Krug testified at the hearing that she is a manager of contract administration for Howard Johnson. HT 11-12. Ms. Krug testified that, under the licensing agreement entered into by Inn Development, Inn Development was obligated to pay 6.5 percent of gross room revenues to Howard Johnson for the first two years of the licensing agreement. Id. at 13-14. During the third and fourth years of the agreement, Inn Development would have to pay 7 percent of gross room revenues to Howard Johnson. Id. From the fourth through the fifteenth year of the contract, Inn Development would have to pay 8.5 percent of gross room revenues to Howard Johnson. Id.

Howard Johnson calculates its damages as follows. HT 16. The licensing agreement with Inn Development was in place for 11 months and generated fees of $33,383.50. Id. at 15-16. Dividing those fees by 334, which is the number of days during which the contract was in place, Howard Johnson arrives at an average daily fee of $99.95. Id. at 16. Taking that average daily fee and multiplying it by the number of days remaining in the entire 15-year

3

contract, which is 5,002 days, Howard Johnson arrives at its damages calculation of $499,949.90. Id.

In support of its quest for half a million dollars in damages, Howard Johnson raises a number of arguments to show the reasonableness of its request. First, Howard Johnson points out that its damages calculation is based on fees from Inn Development of 6.5 percent of gross room revenues, while if the contract had been carried out to its end, Inn Development would have eventually have paid 8 percent of gross room revenues. Id. at 13-14, 16. Also, Howard Johnson calculated the average fees per room from all hotels across its system and noted that the average fees from the Norfolk facility, on which its damages calculation are based, are approximately half of the average fees per room system-wide. Id. at 18-20. Finally, Howard Johnson compared the fees from the Norfolk facility to fees paid by hotels in the Lincoln, Grand Island, and Omaha, Nebraska, markets and concluded that the fees were comparable. Id. at 21-24; Exhibits D, E & F; and Docket No. 95.

In its decision granting summary judgment to Howard Johnson, the district court specifically held that an evidentiary hearing was necessary to address two issues: (1) what cost savings enured to Howard Johnson as a result of Inn Development's breach of the licensing agreement, and (2) what efforts Howard Johnson made to mitigate its damages. See Docket No. 78, at 21. As to those two issues, Ms. Krug testified that there were no cost savings. HT 26. The benefit to Inn Development provided by Howard Johnson under the contract was the use of its name, nation-wide marketing, and a national

reservations system.  Howard Johnson experienced no reduction in the cost of providing these benefits as a result of Inn Development's breach.[2]  Id.

As to mitigation of damages, Ms. Krug was able to say only that Howard Johnson had had a sales person try to replace the Howard Johnson franchise in Norfolk, but that Howard Johnson had not been able to secure a replacement due to the current state of the economy.  HT 26-27.  When pressed for specifics, Ms. Krug could not say how many sales persons attempted to find a replacement for the Inn Development contract, how many persons or facilities were contacted as potential replacements, whether specific facilities in Norfolk were contacted, how many times contacts were made, or any other specifics.  HT 38-39, 43-44.  This complete lack of evidence of mitigation was true for both the period before Howard Johnson filed this lawsuit (from May 2, 2003, to October, 2006), and for the period after suit was filed (from October, 2006, to June, 2009).  Id. at 44-45.  Howard Johnson made no attempt to document any efforts it made to mitigate its damages.  Id. at 38-41, 43-45,

Ms. Krug testified that a large part of the reason why Howard Johnson was not able to replace the Inn Development contract was due to the current state of the economy.  HT 26-27.  Ms. Krug also testified that, due to the current downturn in the economy, Howard Johnson's income from its facilities has not been increasing.  HT 33.

---

[2]Interestingly, Inn Development also experienced no increase in its revenue when Howard Johnson began providing these things under the licensing agreement.  HT at 53.

5

Ms. Logan testified that, within one month of receiving notice that the contract between Inn Development and Howard Johnson was terminated, Inn Development applied for reinstatement with Howard Johnson. HT 48, 50. The application for reinstatement was accompanied by a $1,000 check for the reapplication fee, which check was cashed by Howard Johnson. Id. at 51. Howard Johnson acknowledged that it had received Inn Development's application for reinstatement on May 27, 2003. HT 36-37.

Ms. Logan further testified that, when Inn Development originally entered into the licensing agreement with Howard Johnson, there had been a punchlist of items at the facility that were to be changed, repaired, or upgraded in order for Inn Development to market itself as a Howard Johnson. HT 48. Ms. Logan testified that, at the time the agreement was breached, there was only one significant issue left on the punchlist. Id. That item had to do with the sign for the facility. Id. The current sign was somewhat hidden, and so the punchlist required Inn Development to put up a new sign. Id. However, that required Inn Development to obtain a variance from local authorities. Id. Inn Development was in the administrative process of obtaining that variance at the time the application for reinstatement was submitted by Inn Development to Howard Johnson in May of 2003. Id.

Also, Ms. Logan testified that the original contract between Inn Development and Howard Johnson required her to attend manager's training in New Jersey, which she had not yet done at the time the contract was breached. Id. After submitting Inn Development's application for reinstatement, Ms. Logan contacted Howard Johnson and inquired about whether she should register for and attend the training. Id. at 48-49. Howard

Johnson indicated that Ms. Logan should attend the training, which she did in October, 2003.  Id. at 49-51.  While in New Jersey attending this training, Howard Johnson had Ms. Logan sign a new offering circular.  Id.

After returning from the training in New Jersey, Ms. Logan made several phone calls to different employees of Howard Johnson to determine the status of Inn Development's application for reinstatement.  Id. at 49.  Ms. Logan never received confirmation that Inn Development had been reinstated or that it had been rejected.  Id. at 49-51.

Ms. Logan also testified that Norfolk, Nebraska, was a somewhat stagnant market that never grew commercially.  Id. at 47-48.  It lacked a convention center or any other major attraction.  Although occasionally new businesses opened in Norfolk, it almost always resulted in the closure of some existing business.  Id.  For example, Ms. Logan testified that when the Inn Development facility opened (as the "White House Inn"), a Holiday Inn Express also opened at the same time.  Id.  The arrival of these two new hotels in Norfolk resulted in the closure of a Ramada Inn in Norfolk a short time thereafter.  Id.  Ms. Logan explained that, when a new hotel came to town, it did not result in new business, it just resulted in the new hotel taking business away from existing facilities.  Id.

In late 2003 or early 2004, coincidentally or not, while the Inn Development application for reinstatement was still pending with Howard Johnson, another new hotel, a Hampton Inn, opened up in Norfolk.  Id. at 47-48.  Ms. Logan and Mr. Orr had continued operating the Inn Development facility, reverting to calling it the White House Inn, while waiting for the outcome of the application for reinstatement.  Id.  The arrival of the Hampton

Inn in late 2003 or early 2004 resulted in a 50 percent decline in occupancy rates for the Inn Development facility.  Id. at 48.

Ms. Logan testified that the revenue from Inn Development's facility in Norfolk remained constant from before it entered the licensing agreement and after it entered the agreement until the arrival on the scene of the Hampton Inn.  Id. at 53.

Ms. Logan testified that Inn Development took all the necessary steps to obtain reinstatement and that any failure to act on the application for reinstatement was the fault of Howard Johnson.  Id. at 50-51.  Ms. Krug had no first-hand knowledge of Inn Development's application for reinstatement, but testified that the notes in her file indicated that Inn Development failed to carry through with the application process.  Id. at 27-28, 37-38.

## DISCUSSION

The district court found that the contract in question in this case is governed by the law of New Jersey.  See Docket No. 78, at 12 (citing ¶ 17.6.1 of the licensing agreement).  Accordingly, this court also applies New Jersey law to determine Howard Johnson's damages.

Under New Jersey law, "a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Pickett v. Lloyd's, 621 A.2d 445, 454 (N.J. 1993).  Compensatory damages are intended to reimburse the nonbreaching party for losses occasioned by the breach by putting "the injured party in as good a position as he would have had if performance had been rendered as promised."  Donovan v. Bachstadt, 453 A.2d 160, 165 (N.J. 1982).  "Lost profits are one measure of compensatory damages that may be recoverable in a breach of contract action, if they can be

8

established with a 'reasonable degree of certainty.' " RSB Lab. Servs., Inc. v. BSI, Corp., 847 A.2d 599, 608 (N.J. Super Ct. App. Div. 2004) (quoting Stanley Co. of Am. v. Hervules Powder Co., 108 A.2d 616, 626 (N.J. 1954)). "Anticipated profits that are too remote, uncertain, or speculative are not recoverable." Desai v. Bd. of Adjustment of the Town of Phillipsburg, 824 A.2d 166, 172 (N.J. Super Ct. App. Div.), certif. denied, 177 N.J. 492 (2003). A request for lost profits must be based on sound facts and not merely on opinions. Desai, 824 A.2d at 173.

A non-breaching party to a contract has a duty to take reasonable steps to contain or limit his damages. McDonald v. Mianecki, 398 A.2d 1283, 1295 (N.J. 1979); O'Brien Cogeneration, Inc. v. Automatic Sprinkler Corp. of America, 825 A.2d 524, 530 (N.J. Super Ct. App. Div. 2003); C.A.M. v. R.A.W., 568 A.2d 556, 562 (N.J. Super Ct. App. Div. 1990); see also Restatement (Second) Contracts § 350, cmt. c. (where a party to a contract breaches the agreement, the non-breaching party is under a duty to limit his losses, including the duty to secure a substitute transaction). The breaching party has the burden of proving facts showing that the non-breaching party failed to mitigate its damages. Cohen v. Radio-Elecs. Officers Union, 645 A.2d 1248, 1259 (N.J. Super. Ct. App. Div. 1994). Where several factors act as the proximate cause of the plaintiff's injury, it is the plaintiff's burden of proving the allocation of damages. Borough of Fort Lee v. Banque Nat'l. De Paris, 710 A. 2d 1, 5, (N.J. Super Ct. App. Div. 1998).

In one case involving a breach of a hotel franchise agreement by the franchisee, a federal district court found that damages consisting of the last two years of fees that the franchise was in existence was reasonable. Ramada

9

Franchise Systems, Inc. v. Motor Inn Investment Corp., 755 F. Supp. 1570, 1579 (S.D. Ga. 1991). Because franchise fees in such cases are based on "the whimsy of the public," the court held that "gross room sales will most likely never be the same from year to year. . ." Id. Furthermore, the court based its holding on the fact that two years is the average time it takes a "franchisor to replace a terminated franchisee in a particular area." Id. See also Howard Johnson Internat'l, Inc. v. HBS Family, Inc., 1998 WL 411334, *8 (S.D.N.Y. 1998) (Sotomayer, Dist. Judge) (holding that Howard Johnson was entitled to actual damages as a result of its franchisee's breach of the licensing agreement, but suggesting that lost income for the entire 15-year term of the agreement was unreasonable).

Other courts have also held that two years is a reasonable measure of a franchisor's damages for breach of a hotel franchise agreement because that is the average time it takes a franchisor to find a replacement franchisee. See Radisson Hotels Internat'l, Inc. v. Majestic Towers, Inc., 488 F. Supp. 2d 953, 959-960 (C.D. Ca. 2007).

In River Road Associates v. Chesapeake Display and Packaging Co., 104 F. Supp. 2d 418 (D.N.J. 2000), a federal district court applying New Jersey law invalidated a provision in a rental agreement that purported to allow the landlord "to sit idly by and recover monthly rental payments without making any effort to relet or repair the premises." Id. at 424. The court held that "[t]his failure to address the landlord's duty to mitigate renders the provision [in the lease] an unreasonable forecast of the harm anticipated in the event of a breach." Id. The court refused to enforce the provision because doing so would

encourage economic waste and violate New Jersey public policy against such waste.  Id.

In one case, a landlord rented premises in a commercial building to a police department in 1993.  Borough of Fort Lee, 710 A.2d at 5.  The police were to quit the premises in February, 1995, however, the police wrongfully held over through July 1996.  Id.  The landlord sought damages, alleging that the police's presence in his building drove away other tenants.  Id.  The evidence in the record indicated, however, that the landlord had experienced continuing vacancies in the building that began in 1990, before the police began occupancy of the building.  Id.  On this record, the court held that the landlord was not entitled to damages for the vacancies for the entire period because the landlord had not carried his burden of proving the apportionment of damages between the pre-existing problem with the vacancies, and the additional effect, if any, of the police presence in the building on marketability of rental units.  Id. at 5-6.

Howard Johnson's calculation of its damages for the entire 15-year term of the licensing agreement with Inn Development results in an unwarranted windfall to Howard Johnson for several of reasons.  First, although Howard Johnson is requesting the award of a lump sum of damages in the present, those damages represent fees that Howard Johnson would have received in monthly increments spread out over 14 years, through the year 2016.  No testimony or evidence was presented that reduced this $499,949.90 stream of future income figure to a present value.  For example, if Inn Development had continued paying under the contract, it would have paid Howard Johnson $222,888.50 under the contract through the date of the hearing in this matter,

June 11, 2009.[3] Thus, Howard Johnson seeks an award of an additional $277,061.40[4] to be given to Howard Johnson now that, if no breach had occurred, it would not have received under the contract for the next seven years. By investing this $277,061.40 now, Howard Johnson would in fact receive much more in damages than it would have received had the contract never been breached.

A second reason why Howard Johnson's calculation of its damages represents a windfall also has to do with the aspect of future damages. A party has a duty to mitigate its damages that is ongoing–Howard Johnson's would not be entitled to damages for the entire 15-year term of the contract unless it were able to show that it would be incapable of mitigating the damages for that entire 15-year period of time. See Howard Johnson Internat'l, Inc., 1998 WL 411334, *4. No such evidence was admitted at the hearing. Thus, if this court were to award damages for the entire 15-year term of the contract and, post-judgment, if Howard Johnson found a suitable replacement franchisee, it would be recovering double for the period in question.

Also, New Jersey has expressed a public policy against economic waste. River Road Associates, 104 F. Supp. 2d at 424. By allowing Howard Johnson to collect the entire 15-year stream of income (at once, no less), the court would

---

[3]There are 2,230 days from the date the contract terminated on May 2, 2003, through June 11, 2009. Taking the average daily fee calculated by Howard Johnson of $99.95 and multiplying it by the number of days elapsed yields a figure of $222,888.50.

[4]The $277,061.40 figure comes from taking Howard Johnson's request for damages of $499,949.90 and subtracting fees they would have earned through the date of the hearing, $222,888.50, which leaves $277,061.40 in future fees.

be encouraging Howard Johnson to commit economic waste by putting forth no efforts to mitigate its damages.[5]  Id.

Finally, the court holds that damages for the full 15-year term of the licensing agreement between Inn Development and Howard Johnson are both speculative and unreasonable.  Many factors may influence the profitability of a hotel franchise, such as changes in the location or formation of highways; changes in traffic patterns; the cost of gas and oil; and the general ability of the public to use hotel facilities.  See Ramada Franchise Systems, Inc., 755 F. Supp. at 1578.  Because of the inexactitudes of these factors, "running a [hotel] franchise is a gamble."  Id.

At the hearing in this matter, Howard Johnson itself introduced evidence into the record that factors other than Inn Development's breach of the agreement are the proximate cause, at least in part, of Howard Johnson's purported damages–the current downturn in the economy.  See HT 16, 26-27, 33-34.  In fact, the testimony of Ms. Krug seemingly placed the *entire* blame for failing to obtain a replacement franchisee on the economy:  "Unfortunately, due to the economy, we have not yet been able to replace the [Inn Development] facility in the market."  HT 26-27.  Furthermore, defendants introduced evidence that the arrival of the Hampton Inn in the Norfolk market was also a proximate cause of Howard Johnson's damages.  HT 47-49.

---

[5]Howard Johnson could have mitigated its damages, also, by processing the application for reinstatement which Inn Development promptly submitted. However, the evidence submitted at the hearing is unclear about which party "dropped the ball" in processing this application.  In any event, it is clear that, even if Inn Development were reinstated with Howard Johnson, the arrival of the Hampton Inn would have affected the viability of the facility.

Howard Johnson bears the burden of apportioning the damages among these various proximate causes. Borough of Fort Lee, 710 A.2d at 5. Howard Johnson also has a duty to mitigate its damages. The evidence as to both such issues was distinctly lacking. Defendants, for their part, introduced evidence that the fortunes of the Inn Development facility in Norfolk, whether operating as the "White House Inn" or as a "Howard Johnson" hotel, were inevitably going to be decimated by the arrival of the Hampton Inn in Norfolk. Accordingly, the court concludes that Howard Johnson has not shown an entitlement to lost profits for the entire 15-year term of the contract.

The above-discussed cases indicate that two years is the average time it takes a hotel franchisor to replace a franchisee whose wrongful breach of the hotel agreement results in termination of the agreement. Radisson Hotels Internat'l, Inc., 488 F. Supp. 2d at 959-960; Ramada Franchise Systems, Inc., 755 F. Supp. at1579 . Furthermore, the Hampton Inn arrived in approximately the spring of 2004, resulting in a 50-percent reduction in occupancy rates for the Inn Development facility. This was approximately one year following the termination of the agreement with Inn Development. The court concludes, based on the above law and evidence presented, that an award to Howard Johnson of two years of lost fees under the Inn Development agreement will reasonably compensate Howard Johnson for its losses. This two-year period extends more than a year after the arrival of the Hampton Inn, is commensurate with the average time a franchisor needs to replace a lost franchisee, and coincides with the current economic downturn. Using the

figures put forth by Howard Johnson at the hearing, two years of lost revenue under the Inn Development contract is $72,963.50.[6]

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court hereby recommends that a damages award of two years of lost revenue under the Inn Development contract be made to Howard Johnson in the amount of $72,963.50.

In addition, the judgment in this matter should encompass the $10,983.72 that the district court previously found Howard Johnson is entitled to on a separate note obligating defendants to Howard Johnson, together with prejudgment interest on that amount and attorney's fees. These matters were not the subject of the evidentiary hearing which this court was asked to hold, and so no recommendation is made as to these issues or amounts.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the

---

[6] Howard Johnson calculated revenue from the Inn Development contract at $99.95 per day. Two years is 730 days, multiplied by the daily revenue of $99.95, yields $72,963.50.

district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated July 31, 2009.

BY THE COURT:

/s/ *Veronica L. Duffy*
VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE